UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ESTHER OJEMUDIA,

                Plaintiff,                     No. 06-CV-11186-DT

vs.                                Hon. Gerald E. Rosen

RITE AID SERVICES, L.L.C.,

                Defendant.
_____/

OPINION AND ORDER REGARDING
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on   March 28, 2008

PRESENT:  Honorable Gerald E. Rosen
                    United States District Judge

I. INTRODUCTION

This hostile work environment/constructive discharge action is presently before

the Court on Defendant Rite Aid Services, L.L.C.'s Fed. R. Civ. P. 56 Motion for

Summary Judgment. Plaintiff has responded to Defendant's Motion to which response

Defendant has replied. Having reviewed and considered the parties' briefs and

supporting evidence, and having heard the oral arguments of counsel at the hearing held

on December 11, 2007, the Court his now prepared to rule on this matter. This Opinion

and Order sets forth the Court's ruling.

1

## II. PERTINENT FACTS

Plaintiff Esther Ojemudia is a former hourly uniformed security guard employed by Defendant Rite Aid Services, L.L.C. ("Rite-Aid"). Ms. Ojemudia, who was born and raised in Nigeria, was hired by Rite Aid in April 2002, three years after she immigrated to the United States. She left her employment with Rite Aid in February 2005. From March 2004 through the end of her employment, Ms. Ojemudia worked at Rite Aid's store at Moross and Mack Avenue in Detroit. She generally worked the afternoon shift, 8:00 p.m. to 11:00 p.m. As a uniformed security guard, Plaintiff functioned as a visible presence in the store to deter shoplifters and theft. She reported to Nikki Tompkins who held the position of Security Coordinator.

In addition to uniformed security guards, Rite Aid also employs plain clothes Loss Prevention Associates ("LPAs") in certain stores. LPAs are responsible for monitoring security cameras and individuals in the store and are responsible for apprehending shoplifters. Like uniformed security guards, LPAs are hourly employees. Although they are higher level employees above uniformed security guards, LPAs have no supervisory authority over the uniformed guards.

The uniformed security guards' immediate supervisor was Nikki Tompkins. Above Ms. Tompkins was Loss Prevention Manager Eric Trotter. LPAs reported directly to the Loss Prevention Manager. The next person in the chain of command was the Human Resources Manager Gregory Lozier.

Both Security Coordinator Nikki Tompkins and Loss Prevention Manager Eric Trotter were responsible for a number of stores. They only visited any particular store two or three times a month.

Because their supervisor was not "on site" at all times, uniformed security guards were required to make regular phone contact with their supervisor, Nikki Tompkins, as part of their regular job duties, such as to report incidents in their stores and to file reports. All of the uniformed guards were provided with Ms. Tompkins's office phone number as well as her pager number.[1] While uniformed security guards and LPAs did not report directly to store management, there was also a store manager and assistant managers on duty at all times at the Moross/Mack store.

Pursuant to Rite Aid's employment policies, complaints involving any incident of harassment are to be reported promptly to the employee's direct supervisor or manager. [*See* Rite Aid "Harassment in the Workplace" Policy, Defendant's Ex. B]  An employee is not required to complain first to his or her supervisor, however, if that person is the individual harassing the employee. *Id.*  Instead, the employee may report the harassment to the Vice President of Human Resources. *Id.*  Notwithstanding the employee's obligation to follow this procedure, he or she can also complain to any manager, and any manager who receives complaints or who observes harassing conduct is also obligated to

---

[1] Security guards were also given Tompkins' cell phone number but according to Plaintiff, Tompkins did not want security guards calling her on her cell phone. She instructed them to call her pager if they could not reach her on her office phone.

inform the Human Resources Manager. *Id.*

Plaintiff Ojemudia claims in her Complaint that, some time in December 2004, Varney Gray, an LPA at Rite Aid's Moross/Mack store, began sexually harassing her.[2] However, in her deposition, Ms. Ojemudia testified that she did not become uncomfortable with any of Mr. Gray's actions until January 19, 2005. [*See* Plaintiff's Deposition, p. 32.]

During the relevant time period, January through February 2005, Mr. Gray was assigned to two different stores and split his time between the two stores. He spent a portion of his time at the Moross/Mack store and the remainder of his time at the Nine Mile and Dequindre store.

Rite Aid's employment records show that Ms. Ojemudia and Mr. Gray did not work together very often. They first worked together in the summer of 2004. From the end of December 2004 to January 19, 2005, they only worked on the same shift three days -- January 1, 4 and 11 -- and their shifts only overlapped by 45 minutes on January 14, 2005. From January 19, 2005, which is when Plaintiff said she first became uncomfortable with Mr. Gray's conduct, through February 22, 2005, Plaintiff's last day of employment with Rite Aid, the two only worked the same shift four days, but their shifts overlapped approximately 2 hours on several other days.

The Alleged Harassment

---

[2] Like Plaintiff, Varney Gray is also a native of Africa, having been born and raised in Liberia. He immigrated to the United States in 2000 at the age of 30.

Plaintiff's first complained of incident of harassment was on January 19, 2005. According to Plaintiff, on that date, while she was walking the aisles of the store, Varney Gray came up to her and told her he wanted to have an "intimate relationship" with her and that "he was going to do something to make her have sex with him." [Plaintiff's Dep. pp. 58-60.] Then, when she went to the backroom to use the bathroom he followed her, grabbed her by the wrist, and tried to kiss her. *Id.* at 60-62. Plaintiff testified that she pushed him away and told him to just leave her alone. *Id*. at 61. But, according to Plaintiff, Gray did not leave her alone and, once again, when she was about to leave for the day, Gray again grabbed her hand and tried to pull her toward him to kiss her. *Id.* at 63.

Plaintiff claims she attempted to report this conduct to her supervisor, Nikki Tompkins on the day that this encounter occurred, January 19, 2005. Plaintiff paged Tompkins on that date. [Plaintiff's Dep., p. 64.] Tompkins responded to the page, called the store a few minutes later and spoke to Plaintiff. However, after Tompkins and Plaintiff exchanged brief greetings, their call was disconnected. *Id.* at 65; [Tompkins Dep., pp 37-40.] Tompkins did not call Ms. Ojemudia back. *Id.* at 39. Ms. Ojemudia testified that after they were disconnected, she tried paging Ms. Tompkins once again and left the store number as a call-back number but did not hear back from Tompkins. [Plaintiff's Dep., p. 66.] According to Plaintiff, the next day she tried to page Eric Trotter, but that page, too, was not answered. *Id.* She also paged Trotter to her home

phone number, but he never called her back at home, either. *Id.* at 67-68. (Plaintiff testified that when she later personally met with Trotter and told him she had paged him he told her he might have been out of town. *Id.*) Plaintiff made no other attempt to report the incident to anyone in Rite Aid management and instead, decided to wait to talk to Ms. Tompkins the next time she was in the store. *Id.* at 72-73; 76. But before that happened, according to Plaintiff, she and Mr. Gray had another encounter.

On January 26, 2005, Plaintiff brought a tape recorder to record any contact she might have with Mr. Gray.[3] Plaintiff testified that on January 26th, Gray once again told her he wanted to have sex with her, again stated that he would do something to "make" her have sex with him, and again tried to kiss her several times against her will. *Id.* at 72-74. According to Plaintiff, Gray told her that he loved her, and that every time he saw her he wanted to have sex with her. *Id.* at 74. Plaintiff again paged Ms. Tompkins, but Tompkins again did not call her back. *Id.* at 76, 77.

On January 31, Ms. Ojemudia again paged Ms. Tompkins and was finally able to reach her. *Id.* at 72, 78. She told Ms. Tompkins that Gray had been sexually harassing her, and that she had taped some of their encounters. *Id.* at 72. Tompkins told Plaintiff to write a report of the events and that she would come to the store on February 4th to

---

[3] Plaintiff said she brought her husband's mini-tape recorder with her to work every day after January 19th hoping to tape record any contact he had with Mr. Gray. It was not until January 26th, however, that she and Gray worked the same shift. She tried tape recording her encounter with Gray that day but the recording she made was largely inaudible.

pick it up.  *Id*. at 72, 78-79; Tompkins Dep., pp. 41-42.  Plaintiff complied with Ms.

Tompkins directive and wrote a lengthy account of the events of January 19-26.[4]

---

[4]  Plaintiff wrote the following account:

Varney Gray, the loss prevention associate has been harassing me sexually at work.  On the 19th of January, 2005, he come to me and told me he had something to tell me.  He asked me if I had a tape recorder on me.  I told him no. . . Then, he told me he wanted to have an intimate relationship with me.  I told him no, that I am married and that is a sin.  He said "I was just trying to be like Jesus Christ, but nobody is perfect.  That Jesus Christ come to die for us to be saved and not to be perfect."  And that he does not know where it is in the Bible.  I asked him why he wanted to cheat on his wife, he said because he did not know if his wife is doing it too.  He said she goes to school and work; that he doesn't know what she does there.

After a while that same day, he came back to me and told me that if I did not yield to it, he was going to do something to make me do it.  He is from Africa and that he can do something to make me do it.  I told him whatever he does would not work on me because God is with me and that the Bible says there shall be no enchantment against Israel and there shall be no divination against the sons of Jacob.  He was following me around the store telling me that I am beautiful and he loves me.  I told him to stop and he said nothing can make him stop it even if I cut his throat.  So the next day I came to work with my husband's tape recorder but [Varney] did not come [to work that day.] I kept bringing it until he finally came to work on the 26th of January at about 7:30 p.m.  He started again by saying I missed you and I love and bringing out his lips as if to kiss me.  Then I turned my tape recorder on and asked him why he wanted to have an affair with me [and] if that is how he talks to other people; he said no that I am special, that he has feelings for me.  I asked him why he has feelings for me, he said because he is human and that sometimes he feels like having sex with me.  That when he talks to me he feels better and he said maybe it will take a while for the feeling to go away.  He also said that he wasn't going to change, that I'm the one that will change my mind.  I told him that his feelings for me were lust and he said no, it was love.  I also told him that he is selfish, that he kept his wife at home and wants to be using someone's wife.  He said no, because he love me.  I asked him if he knew that he was worse than the shoplifters; that he was trying to steal from my husband.  He said that he was not stealing from him because he was not doing it to my husband's

Tompkins picked up Plaintiff's report on February 4th. *Id.* at 91. When she did, she told Plaintiff that she had already reported her complaint of Gray's harassment to Eric Trotter and Greg Lozier and said that they would be meeting with her the following Tuesday, February 9th. *Id.* at 93.

Plaintiff did meet with Trotter and Lozier on February 9th. *Id.* at 97. Trotter testified that the meeting lasted over an hour. [Trotter Dep., p. 39.] Both Trotter and Lozier testified that Plaintiff reported that Mr. Gray told her that he loved her, that he wanted to go out with her, and that he wanted to have a sexual relationship with her. *Id.* at 35; Lozier Dep. at 23-24. *See also* Lozier's Notes, Defendant's Ex. F. Trotter also acknowledged that Plaintiff reported to him that Gray had attempted to kiss her. [Trotter

---

face. He said the Bible sais we should love one another and then I asked him if the Bible told him to have sex with me and walked away. I turned off my tape recorder because my break was over. Before he openly said he wanted to have an intimate relationship with me, he usually asked me if I could go out to maybe a restaurant all by myself or maybe go out to dinner with me and when I told him that my culture does not permit a married woman to do that, he tells me culture cannot take me to Heaven, that he wanted to take me out because we are both associates and that he cares abut me because the Bible tells him to. And I told him to stop caring for me, that I'm married. My husband and God care for me. Why don't you care for other people. He says because his spirit just agrees with mine. He said he would have bought me a car when my car broke down, but that my husband would know about it. And I told him if you don't have any selfish motive why are you scared of my husband knowing. I don't know what you are doing or thinking, but one thing he should know is God is not mocked. Whatever you sow that is what you reap. I told him don't expect to play with fire and not get burnt. About a week before the 19th incident, he cooked some food from home and brought it to me at work. I refused to eat it. I told him I don't eat people's food that I eat my food by myself.

Dep., p. 36.] Lozier then asked Plaintiff to prepare a written statement of all of the actions of Mr. Gray that she thought were inappropriate. Plaintiff agreed to do so and went into the adjacent workroom and prepared a four-page handwritten statement. *See* Defendant's Ex. D. The statement substantially reiterated what she had said in her original complaint.

Plaintiff told Trotter and Lozier that she wanted the sexual harassment stopped and wanted Gray disciplined. *See* Plaintiff's Dep., p. 100. She testified that they told her that they would get back to her within five days with the results of their investigation. *Id.* at 98-99, 103. This was, in fact, the company's policy. *See* Lozier Dep., pp. 52, 54.

After meeting with Plaintiff and after reviewing her statement, Lozier and Trotter determined that they would have to interview Gray to get his side of the story as soon as possible. Meanwhile, Lozier told Trotter that Ms. Ojemudia and Mr. Gray should not be working together while they investigated the matter. *See* Lozier Dep., pp. 28-29. He wanted the two separated in order to avoid any further problems between them. *Id.* at 29. According to Lozier, Trotter assured him that Ms. Ojemudia and Mr. Gray were not thereafter scheduled to work together. *Id.*

Lozier also instructed Trotter to contact Gray and set up an interview. Gray, however, was off work a number of days in early February. [Trotter Dep., p. 43.] It was not until February 22, 2005 that Trotter finally contacted Gray and scheduled an interview at the Company's regional office for the next day, February 23, 2005. *Id.* at 44.

According to Trotter, when he finally spoke with Gray on February 22nd, he did not tell him why he wanted to meet with him on the 23rd. *Id.* at 46.

Plaintiff worked the afternoon shift on February 22. About an hour after she punched in, Gray arrived at the store. Plaintiff testified that at approximately 5:00 p.m., Gray approached her with food he had brought with him and offered to share it with her. She refused. [Plaintiff's Dep., p. 112.] According to Plaintiff, Gray then told her he was "going to have sex with me," and then he grabbed her wrist and tried to kiss her. *Id.* at 113. She told Gray that she was going to tell her husband and, in response, Gray allegedly told her that he would just have to beat him up. *Id.* at 113. Plaintiff reported the encounter to Kevin Higgs, the Assistant Manager on duty that night, and wrote out another statement. [*See* Defendant's Ex. I.].[5] According to Plaintiff, upon learning that Plaintiff had reported him, Gray became very angry. [Plaintiff's Dep., pp. 119, 126.]

Gray subsequently positioned himself in the vestibule of the front entrance of the store. *Id.* at 123. He repeatedly motioned to Plaintiff to come over to him. *Id.* Plaintiff testified that she felt threatened by Gray's appearance outside the door because she knew

---

[5] Plaintiff also left Mr. Trotter a voice mail message stating that it was an "emergency" situation, the Mr. Gray was sexually harassing her again, that he grabbed her hand and tried to kiss her, and that he threatened to hurt her husband. [Plaintiff's Dep., pp. 117, 129.] She also paged Ms. Tompkins and tried to call Mr. Lozier. *Id*. at 113, 116, 118. None of the managers called her back. *Id*.

would have to go past him to exit the mall after her shift ended at 11:00 p.m.  *Id.* at 125.[6]

Plaintiff, however, did not wait until 11:00 p.m.  At 9:00 p.m., Plaintiff filled out a "Security Officer Personnel Action Request Form," resigning her position.  On this form, she wrote:

> I, Esther Ojemudia has [sic] resigned from my position as a Rite Aid Security Officer, effective today, the 22nd of February 2005 at 9:00 p.m. because Varney Grey [sic] the loss prevention associate is harrasing [sic] me sexually.

[Defendant's Ex. J.][7]

Not having obtained any relief from her managers, Plaintiff testified she then

---

[6]  According to Plaintiff, although Gray did not stay in front of the store the whole time between 5:00 and 9:00 p.m., (he would "come and go"), when he was in front of the doorway to the store, Gray would gesture to her and repeatedly said to her, "you reported me, you reported me." [*See* Plaintiff's Dep., p. 126.]

[7]  Defendant suggests that Plaintiff's resignation in response to Gray's alleged harassment was simply a ploy to escape the inevitable consequences of the company's decision -- of which Rite Aid Security officers were formally informed the morning of February 22, 2005 -- to terminate the employment of all Rite Aid security guards and outsource the uniformed security guard function to a private security company.  Plaintiff admitted that she was notified by her supervisor Nikki Tompkins a few days before February 22 to come the Rite Aid Regional Office in Madison Heights for a meeting at 11:00 a.m. on the 22nd and she also admits that she was at the Regional Office that morning.  *See* Plaintiff's Dep. p. 108-109.  Human Resources Manager Gregory Lozier attended the February 22 meeting and he testified that he specifically remembers seeing Plaintiff at the meeting and told her after the meeting that he was continuing the investigation of her harassment claim and that he and Eric Trotter were meeting with Varney Gray the next day.  [Lozier Dep., p. 56.] Although Plaintiff testified that she remembers having this conversation with Lozier at the Regional Office on February 22nd, she denies attending any meeting that morning and testified that she had no idea on February 22, 2005 that the security guard functions were going to be outsourced and that she was going to lose her job. [Plaintiff's Dep., p. 150.]

called the police to report the harassment by Varney Gray and then called her husband to come pick her up. *Id.* at 129, 135-137. According to Plaintiff, her husband sat in his pickup truck in front of the store for 90 minutes while she waited for the police and spoke with the officers once they arrived. *Id.* The officers then escorted her out to her car. *Id.* at 113, 144.

After she left the store the evening of February 22, 2005, Plaintiff had no further contact with Rite Aid or anyone in Rite Aid management. *Id.* 146.

The next morning, February 23, 2005, Greg Lozier and Eric Trotter interviewed Varney Gray. Gray was confronted with the allegations made against him by Plaintiff. He denied any wrongdoing and submitted a five-page written statement of his version of his encounters with Plaintiff. [*See* Defendant's Ex. L.] According to Gray, sometime after he and Plaintiff began working together, Plaintiff stated that she was a Christian woman. Gray said that he, Gray, was also a devout Christian and said that he told Plaintiff he was a deacon in his church. [Gray Dep., p. 33.] According to Gray, at that point he told Plaintiff that he thought it was important for co-workers to "love one another" in order to work in harmony. *Id.* at 35-37. Gray testified that he made this comment in response to Plaintiff's comment to him that she was a Christian and he used to word "love" in a scriptural sense and did not in any way intend any sexual connotation to the word:

> I told her look, we are working here, we all love one another, I said if we love one another, we'll be able to do this work to the best of our ability. But if we create hatred, it will be very bad. That was the only time I use the word love.

*Id.* at 35-37. Gray testified that Plaintiff would repeatedly ask him what he meant by saying they should "love each other" and he would tell her that he did not want a romantic relationship; that he was simply expressing his belief that co-workers should do their work together with love. *Id.* at 37-40. Gray explained these encounters as follows:

> I told Ester we all want to love one another while we [sic] working together. I don't mean love her like lover go sleep in bed. Then this lady, she said she misinterpret you. I said I told her that that's what I mean. Every day when Ester come to work, she will come to ask me, do you love me? I say what do you mean do you love me? She said do you really love me or you only want - excuse me for the language - or you only what to have me and forget about me. I say what's wrong with you, are you out of your mind or something? I said the love I'm talking about, I don't mean intimate love, I don't mean to make love to you to go sleep in bed. I'm married. So she did it I think two, one or two times, she was going do you love me? I say well, I love you in Christ as a brother and sister who love one another, so I don't know what type of love you talking about.

*Id.* at 39-40.

After interviewing Gray, Trotter and Lozier made several attempts to contact Plaintiff to obtain more information from her. [Lozier Dep., pp. 44-46.] Plaintiff never returned their calls. Ultimately, Lozier sent Plaintiff a certified letter asking her to contact him so he could ask her some more questions about her allegations. [*See* Defendant's Ex. M.] This letter was never signed for and was ultimately returned to Rite Aid. *Id.*

Lozier, therefore, concluded his investigation based upon the information he had which included the statements from Plaintiff and Gray and the interviews of both individuals. Lozier's determination was that this was a "he said, she said" situation.

[Lozier Dep., p. 46.] He also believed there was some sort of cultural misunderstanding between the two.  *Id.*  Lozier noted that Plaintiff had told him there were no witnesses to any of the allegations[8] and no other complaints against Gray had ever been lodged against him.  *See* Defendant's Ex. N.  The investigation, therefore, was closed.

On March 20, 2006, Plaintiff filed the instant action complaining of sexual harassment and constructive discharge in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.* [Count I] and the Michigan Elliott-Larsen Civil Rights Act, M.C.L. § 37.2101 *et seq.* [Count II].  Discovery is closed and Defendant now moves for entry of summary judgment in its favor.

## III.  DISCUSSION

### A.  STANDARDS APPLICABLE TO MOTIONS FOR SUMMARY JUDGMENT

Summary judgment is proper "'if the pleadings, depositions, answer to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'"  Fed. R. Civ. P. 56(c).

Three 1986 Supreme Court cases -- *Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); and *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) -- ushered in a "new era" in the

---

[8]  In her deposition, however, Plaintiff did identify two or three cashiers whom she claimed witnessed Gray's conduct toward her but there is no evidence of record concerning these alleged witnesses or what they allegedly observed.

standards of review for a summary judgment motion.  These cases, in the aggregate,

lowered the movant's burden on a summary judgment motion.[9]  According to the *Celotex*

Court,

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof.

*Celotex*, 477 U.S. at 322.

After reviewing the above trilogy, the Sixth Circuit established a series of

principles to be applied to motions for summary judgment.  They are summarized as

follows:

> * The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case.  This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

> * The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

> * The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

> * The trial court has more discretion than in the "old era" in evaluating the respondent's evidence.  The respondent  must "do more than simply show that there is some metaphysical doubt as to the material facts."  Further, "[w]here the

---

[9]"Taken together the three cases signal to the lower courts that summary judgment can be relied upon more so than in the past to weed out frivolous lawsuits and avoid wasteful trials."  10A C. Wright, A. Miller, M. Kane, <u>Federal Practice & Procedure</u>, § 2727, at 35 (1996 Supp.).

record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is plausible.

*Betkerur v. Aultman Hospital Association*, 78 F.3d 1079, 1087 (6th Cir. 1996). *See also, Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989). The Court will apply the foregoing standards in deciding Defendant's motion in this case.

B.     ISSUES OF FACT PRECLUDE ENTRY OF SUMMARY JUDGMENT ON PLAINTIFF'S HOSTILE WORK ENVIRONMENT AND CONSTRUCTIVE DISCHARGE CLAIMS

Title VII of the Civil Rights Act of 1964 prohibits an employer from discriminating "against any individual with respect to his[/her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). A plaintiff may establish a violation of Title VII by proving that the discrimination based on sex created a hostile or abusive work environment. *See Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986); *Black v. Zaring Homes, Inc*., 104 F.3d 822, 825 (6th Cir.1997). Sex discrimination in this form occurs "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993) (citations and internal quotation marks omitted). However, not all conduct that has sexual overtones is forbidden under the statute. *Meritor*, 477 U.S. at 67. The harassment must affect a "term, condition, or privilege" of the employment. *Id*. The *Harris* Court stated that:

mere utterance of an ... epithet which engenders offensive feelings in an employee, does not sufficiently affect the conditions of employment to implicate Title VII.  Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment -- an environment that a reasonable person would find hostile or abusive -- is beyond Title VII's purview.  Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation.

510 U.S. at 21-22 (internal citations omitted).

Michigan law is similar.  The Michigan Elliott-Larsen Civil Rights Act broadly defines sexual discrimination as including sexual harassment, and includes within its definition of sexual harassment, conduct which creates a hostile work environment:

Discrimination because of sex includes sexual harassment which means unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct or communication of a sexual nature when:

* * *

(iii) Such conduct or communication has the purpose or effect of substantially interfering with an individual's employment . . . or creating an intimidating, hostile, or offensive . . . environment.

M.C.L. § 37.2103(h).[10]

---

[10]  The Michigan Act differs from Title VII in one respect: Whereas the "based on sex" requirement of a Title VII hostile work environment claim includes sexually related remarks and conduct, as well as non-sexual conduct "where it evinces anti-female animus," *Williams v. General Motors Corp.*, 187 F.3d 553, 565 (6th Cir. 1999), a sexual harassment hostile work environment claim under the Elliott-Larsen Act does not. Where there are no "unwelcome sexual advances, requests for sexual favors, or other verbal or physical conduct or communication *of a sexual nature*," the plaintiff fails to make out a claim of sexual harassment under the Elliott-Larsen Act.  *Haynie v. State of Michigan*, 468 Mich. 302, 313-14, 662 N.W.2d 129, 135-36 (2003) (overruling *Koester v. Novi*, 458 Mich. 1, 580 N.W.2d 835 (1998)).  This distinction, however, is not relevant in this case

The Michigan Supreme Court has determined that an objective reasonableness standard must be utilized to determine whether a hostile work environment exists under the Michigan Elliott-Larsen Act. *Radtke v. Everett*, 442 Mich. 368, 398, 501 N.W.2d 155, 169 (1993). Thus, a sexually hostile work environment claim under Michigan law is actionable "only when, in the totality of circumstances, the work is so tainted by sexual harassment that a reasonable person would have understood that the defendant's conduct or communication had either the purpose or effect of substantially interfering with the plaintiff's employment, or subjecting the plaintiff to an intimidating, hostile, or offensive work environment." *Id.*[11] To satisfy this requirement, it is generally accepted that the

as Plaintiff's claims are predicated on allegations of sexually related remarks and conduct which would be covered under both Title VII and the Michigan statute.

[11] As the Michigan Supreme Court explained in *Radtke*,

[A] reasonableness inquiry is necessary to fulfill the purpose of the [Michigan Civil Rights] act. As noted, the purpose of the act is to combat serious demeaning and degrading conduct based on sex in the workplace, and to allow women the opportunity to fairly compete in the marketplace. The reasonableness inquiry, (i.e., objectively examining the totality of the circumstances) in a hostile work environment action, is simply a method of objectively determining whether a hostile work environment existed. The alternative would be to accept all plaintiffs' subjective evaluations of conduct, thereby imposing upon employers liability for behavior that, for idiosyncratic reasons, is offensive to an employee. We believe that such a result is contrary to both the plain meaning of the statute, as well as the statute's overall purpose. [Citation omitted.] To hold the contrary would delimit the act and ensure a deluge of unwarranted litigation in contravention of the act's purpose.

442 Mich. at 387, 501 N.W.2d at 164.

plaintiff must establish that the complained sexual harassment was "severe" or

"pervasive." *Dix v. Siemens Information Systems, Inc.,* 82 F.3d 417, 1996 WL 156695

(6th Cir. 1996) (applying Michigan law).

To make out a *prima facie* case of hostile work environment based on sexual

harassment by a co-worker under Title VII, the following elements must be

demonstrated:

> (1) [the plaintiff] was a member of a protected class; (2) [the plaintiff] was
> subjected to unwelcome harassment; (3) the harassment complained of was
> based upon sex; (4) the harassment unreasonably interfered with the
> plaintiff's work performance or created a hostile or offensive work
> environment that was severe and pervasive; and (5) the employer knew or
> should have known of the charged sexual harassment and failed
> unreasonably to take prompt and appropriate corrective action.

*Fenton v. HiSAN, Inc.*, 174 F.3d 827, 829-30 (6th Cir.1999).[12]

Turning to the instant action, and viewing the facts in a light most favorable to

_____

[12] The same elements are required to make out a *prima facie* claim under the
Michigan Elliott-Larsen Act.  Under the Michigan Act, it must be shown that:

> (1) the employee belonged to a protected group;
> (2) the employee was subjected to communication or conduct on the basis
> of sex;
> (3) the employee was subjected to unwelcome sexual conduct or
> communication;
> (4) the unwelcome sexual conduct or communication was intended to or in
> fact did substantially interfere with the employee's employment or created
> an intimidating, hostile, or offensive work environment;  and
> (5) respondeat superior.

*Chambers v. Trettco,* Inc., 463 Mich. 297, 311, 614 N.W.2d 910, 915 (2000) (quoting,
*Radtke v. Everett,* 442 Mich. 368, 382-3,  501 N.W.2d 155, 162 (1993)).

Plaintiff, the Court finds that the first three elements of a *prima facie* claim are clearly satisfied and a material issue of fact exists as to whether the comments and conduct complained of were severe or pervasive enough to create an objectively hostile work environment so as to satisfy the fourth *prima facie* element. The Court must consider the totality of the circumstances when determining whether, objectively, the alleged harassment is sufficiently severe or pervasive to constitute a hostile work environment. *Harris, supra*, 510 U.S. at 23, 114 S.Ct. at 371, *Bowman v. Shawnee State University*, 220 F.3d 456, 463 (6th Cir. 2000). "The issue is not whether each incident of harassment standing alone is sufficient to sustain the cause of action in a hostile environment case, but whether -- taken together -- the reported incidents make out such a case. The work environment as a whole must be considered rather than a focus on individual acts of alleged hostility. Isolated incidents, however, unless extremely serious, will not amount to discriminatory changes in the terms or conditions of employment." *Id.* (citations and internal punctuation omitted). The Supreme Court has instructed courts that the totality of circumstances consideration is to include "'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's performance,'" *Jackson v. Quanex Corp*., 191 F.3d 647, 658 (6th Cir.1999) (quoting *Harris, supra*). Further, the "conduct in question must be judged by both an objective and a subjective standard: the conduct must be severe or pervasive enough to create an

environment that a reasonable person would find hostile or abusive, and the victim must subjectively regard that environment as abusive." *Id.* at 658 (quoting *Black v. Zaring Homes, Inc.*, 104 F.3d 822, 826 (6th Cir.1997)). *See also Radtke, supra*, 442 Mich at 398, 501 N.W.2d at 169.

Defendant's position is that because Plaintiff and Varney Gray did not work together every day, Gray's comments and conduct should be viewed as sporadic and not severe or pervasive enough to create an objectively hostile work environment. However, even though Gray did not work every day with Plaintiff, she testified that she was repeatedly subjected to his sexual comments and requests for sex whenever he was at the store. The complained of conduct, thus, was more than a "few isolated comments" and "requests for dates" as argued by Defendant.

Gray's alleged conduct involved not only comments of a sexual nature, but, according to Plaintiff, also explicit requests for sex, physical touching and restricting Plaintiff's freedom of movement. The Sixth Circuit recently reversed a district court's grant of summary judgment to the defendant-employer on a sexually hostile work environment claim where the plaintiffs' evidence included not only sexually explicit comments but also acts of touching and unwelcome physical contact. *See Hawkins v. Anheuser-Busch, Inc.*, ___ F.3d ___, 2008 WL 423442 (6th Cir., Feb. 19, 2008). "[A]cts of touching and unwelcome physical contact. . . establish an element of physical invasion" and "harassment involving an 'element of physical invasion' is more severe

than comments alone." *Id.* at **8-9. *See also Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 571 (2d Cir.2000) (finding that the physically threatening behavior of cornering a victim "brings this case over the line separating merely offensive or boorish conduct from actionable sexual harassment.") Gray's comments further included threats to force Plaintiff to have sex with him. A threat to force the plaintiff into having sex is, by itself, sufficiently severe to constitute an actionable sexually hostile work environment. *Lee v. Glessing*, 140 F. Supp. 2d 215, 223 (N.D.N.Y. 2001).

Varney Gray, however, denies having made the comments Plaintiff claims he made and denies having engaged in any of the complained of physical actions. His version is that he only spoke to Plaintiff of love "in the scriptural sense" of Christian love and did not attach any sexual connotation to his comments. In the words of Defendant's own witness, this case presents a classic "he said/she said" scenario. The issue, therefore, is one of credibility, and assessing credibility is a matter for a jury; a court cannot make credibility determinations on summary judgment. *See Anderson v. Liberty Lobby, supra*, 477 U.S. at 255.

Furthermore, even without the credibility issue, as the Sixth Circuit observed in *Jordan v. City of Cleveland*, 464 F.3d 585 (6th Cir. 2006), whether conduct is severe or pervasive is "quintessentially a question of fact." *Id.* at 597(quoting *O'Shea v. Yellow Tech Servs., Inc.*, 185 F.3d 1093, 1097 (10th Cir. 1999)). Summary judgment is inappropriate unless, accepting Plaintiff's evidence as true and drawing all justifiable

inferences in her favor, a fact finder could not reasonably conclude that Varney Gray's conduct was so severe or pervasive as to create an abusive work environment. *See Anderson*, 477 U.S. at 250-52, 255, 106 S.Ct. at 2511-12, 2513, (standard for summary judgment). Summary judgment is inappropriate here because "reasonable minds could differ" as to whether Gray's behavior created a hostile atmosphere. *See id.* at 250, 106 S.Ct. at 2511. While a factfinder may well conclude that Plaintiff's work environment was not so objectionable as to alter negatively the terms and conditions of a reasonable person's employment, the Court cannot say that the record evidence compels only that result here.

The Court also finds that an issue of fact exists as to whether Defendant took prompt and appropriate corrective action upon being notified by Plaintiff of Varney Gray's alleged harassment of her. Rite Aid was under an obligation, under both federal and state law, to promptly take reasonable and adequate steps to stop the harassment upon being put on notice of it. *See Faragher v. City of Bocal Raton*, 524 U.S. 775, 118 S.Ct. 2275 (1998); *see also, Williams, supra*, 187 F.3d at 561; *EEOC v. Harbert-Yeargin, Inc.*, 266 F.3d 498, 511 (6th Cir. 2001); *Marquis v. Tecumseh Products Co.*, 206 F.R.D. 132 (E.D. Mich. 2002); *Chambers v. Trettco*, 463 Mich. 297, 614 N.W.2d 910 (2000).

Defendant in this case was put on notice of the alleged harassment at least as of January 31, 2005, when Plaintiff was finally able to reach her supervisor, Nikki Tompkins. Tompkins' immediate response was to have Plaintiff write out a report of the

alleged harassment which she did not pick up until February 4th, five days later.
Tompkins allegedly reported before that date what Plaintiff had verbally told her on
January 31st to Eric Trotter and Greg Lozier. But Trotter and Lozier did not contact
Plaintiff until meeting with her on February 9th -- 10 days after Plaintiff had told
Tompkins about the harassment. Then, after meeting with Plaintiff on the February 9th,
Trotter's and Lozier's immediate response was to have Plaintiff write out yet another
report. It was not until February 23rd -- almost a month after Plaintiff complained to
Nikki Tompkins about Gray's harassment and the day after Plaintiff felt compelled to
resign -- that any investigation into Plaintiff's allegations was conducted. It was not until
that date that Trotter and Lozier interviewed Varney Gray.

Defendant has proffered no evidence to demonstrate that any actions were taken to
insure that Plaintiff and Gray were separated pending completion of the investigation.
Although Trotter had assured Lozier on February 9th that Ms. Ojemudia and Mr. Gray
were not thereafter scheduled to work the same shift, Defendant does not dispute that the
two employees' schedules frequently overlapped by one to two hours, nor does
Defendant dispute that no effort was taken to keep Gray away from Plaintiff on February
22nd -- the day when she resigned because of Gray's harassment -- until after Plaintiff
summoned the police to do so.

Under these circumstances, the Court cannot say, as a matter of law, that
Defendant took "prompt and appropriate corrective action" to prevent further harassment

of the Plaintiff.

For all of the foregoing reasons, the Court finds that summary judgment on Plaintiff's hostile work environment claim is denied.

The same reasons that preclude summary judgment on Plaintiff's hostile work environment claim also preclude summary judgment on Plaintiff's "constructive discharge" claim. In order to prove that she was constructively discharged, Plaintiff must establish that Defendant made her working conditions so intolerable that a reasonable person would feel compelled to quit her job. *Champion v. Nation Wide Security*, 450 Mich. 702, 710 (1996); *see also, Agnew v. BASF Corporation*, 286 F.3d 307, 310 (6th Cir. 2002). Plaintiff's constructive discharge claim is predicated on the very same facts upon which her hostile work environment claim is based, and as indicated, these facts are disputed. Therefore, summary judgment is precluded.

<u>CONCLUSION</u>

For all of the reasons set forth above in this Opinion,

IT IS HEREBY ORDERED that Defendant's Motion for Summary Judgment is DENIED.


s/Gerald E. Rosen     
Gerald E. Rosen
United States District Judge

Dated: March 28, 2008

I hereby certify that a copy of the foregoing document was served upon counsel of record on March 28, 2008, by electronic and/or ordinary mail.

s/LaShawn R. Saulsberry
Case Manager
